IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 16, 2018

**STATE OF TENNESSEE v. JEREMY ARTHUR KIMBLE**

**Appeal from the Circuit Court for Montgomery County**
**No. CC17-CR-374     William R. Goodman III, Judge**

_____

**No. M2017-02472-CCA-R3-CD**

_____

The Defendant, Jeremy Arthur Kimble, received an effective thirty-five-year sentence for his guilty-pleaded convictions to four counts of rape of a child, two counts of rape, and one count of continuous sexual abuse of a child. The Defendant appeals, arguing that the trial court erred in enhancing his sentencing terms for his rape of a child convictions above the minimum in the range. The Defendant contends that the trial court improperly applied certain enhancement factors and failed to apply a pertinent mitigating factor. Following our review of the record, we affirm the judgments of the trial court given that the Defendant held and violated a position of trust as the victim's step-father, that the offenses were committed to gratify the Defendant's desire for pleasure or excitement, and that the repeated abuse resulted in an unwanted pregnancy. However, in accordance with this opinion, we remand the case for entry of corrected judgment forms and for additional judgment forms for each count of the indictment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court**
**Affirmed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT H. MONTGOMERY, JR., JJ., joined.

Chase T. Smith, Clarksville, Tennessee, for the appellant, Jeremy Arthur Kimble.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Kimberly S. Lund, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

In March 2017, the Montgomery County Grand Jury returned a twenty-five-count indictment against the Defendant for sexual acts committed against his step-daughter. The Defendant was charged with twelve counts of rape of a child for acts occurring between March 1, 2014, and March 14, 2015; four counts of rape for acts occurring between March 15, 2016, and January 18, 2017; four counts of incest for acts occurring between March 15, 2016, and January 18, 2017; four counts of sexual battery by an authority figure for acts occurring between March 15, 2016, and January 18, 2017; and continuous sexual abuse of a child for acts occurring between March 15, 2016, and January 18, 2017. See Tenn. Code Ann. §§ 39-13-503, -13-518(b)(1), -13-522, -13-527, -15-302. The Defendant thereafter entered an "open" guilty plea to four counts of rape of a child, a Class A felony; two counts of rape, a Class B felony; and continuous sexual abuse of child, a Class A felony; and the remaining charges were dismissed. The guilty plea hearing transcript is not included in the appellate record.[1]

At the November 14, 2017 sentencing hearing, the presentence report was admitted as an exhibit. The presentence report reflected that the Defendant was forty years old at the time of sentencing and that he had no prior criminal history. He graduated from high school and had taken several vocational classes at a community college. The Defendant was active in the United States Army from August 1997 to January 2006, which required the family to move around frequently. The Defendant reported that he received an honorable discharge "as an E5." After his stint in the military, the Defendant worked as a sales associate, a carpenter, and a truck driver. The risk and needs assessment ascertained that the Defendant was at a "moderate level" to re-offend.

The State presented two witnesses. Detective Lisa Fatula testified that, in 2017, she investigated the victim's allegations against her step-father, the Defendant. Detective Fatula attended the victim's forensic interview. During the interview, the fourteen-year-old victim, who was pregnant at that time, said that the Defendant had been raping her since she was twelve years old. The victim disclosed that the Defendant had raped her "a lot" and that there were "too many times to count." The victim further maintained that she had never had sexual contact with anyone other than the Defendant. In addition, the victim told the forensic interviewer that, if she refused to "do it," then the Defendant would find "any reason" to get her into trouble and ground her and that he would subsequently refuse to speak to her and avoid her.

---

[1] When a record does not include a transcript of the guilty plea hearing, this court should determine "on a case-by-case basis whether the record is sufficient for a meaningful review under the standard adopted in Bise." State v. Caudle, 388 S.W.3d 273, 279 (Tenn. 2012). We deem the record sufficient for our review.

-2-

According to Detective Fatula, when she spoke with the Defendant, he "described his relationship with his daughters as he was very close to them." When Detective Fatula initially spoke with the Defendant, he denied the rape allegations, but ultimately, he admitted that "they happened and that they had been happening more often than he [could] count." Detective Fatula testified that the Defendant told her that he had been having sexual intercourse with the victim since they moved to Clarksville in 2013 when the victim was in the sixth grade. Finally, Detective Fatula stated that she could not recall the Defendant's ever expressing "any sort of remorse" during the investigation.

The victim's mother, M.S.,[2] testified that she had three daughters before marrying the Defendant twelve years' prior and that, when she married the Defendant, the victim was three years old. According to M.S., the Defendant and the victim "were close"; the victim called the Defendant "dad"; and the victim did not have any sort of significant relationship with her biological father. M.S. was an "active duty soldier in the Army," which required her to often leave the victim alone with the Defendant. The victim and the other children had household chores, but the Defendant would "ground [the victim] or complain about her not doing her chores" to M.S. According to M.S., the Defendant would "take [the victim's] phone away, or tell her she couldn't go to a friend[']s house, that kind of stuff." Moreover, after the Defendant complained to M.S., she would "in turn fuss at [the victim] as well." M.S. later discovered that one of the victim's chores was allowing the Defendant to rape her. M.S. said that she experienced extreme guilt due to her daughter's being "tortured for the last eight plus years."

M.S. testified that she learned that the victim was pregnant following a wrestling match. According to M.S., the victim "fell on the ground" during the wrestling match, complaining that her stomach hurt. The victim told M.S. that "she was going to throw up and she didn't feel good." M.S. felt the victim's stomach, which "felt weird," so she took the victim to the hospital where they learned that the victim was pregnant. The victim later decided to terminate the pregnancy, which required M.S. and the victim to travel to Florida for the procedure to be performed.

When asked to describe the victim's demeanor, M.S. stated, "[The victim] is the funniest, sweetest child. . . . [S]he's so strong and she's so smart. She's very popular. She's got the most loving sweet little personality, and she can always make you laugh. She's a really great kid. A really good student and an excellent athlete." Subsequently, M.S. was asked if she had "seen any changes in [the victim] since all of this came out[.]" M.S. replied,

---

[2] It is the policy of this court to protect the identity of minors who were the victims of sexual crimes. To further this policy, we refer to the minor victim's mother by her initials only.

[T]here's been a lot of changes. [The victim] used to be a really good student and now she's failing almost every class. She has a lot of anxiety, she's nervous to be around men; whether she knows them or not she's just—she gets awkward. So she has a lot of anxiety and she has a hard time focusing at school. She doesn't know who knows. I mean [the Defendant's] face was in newspaper, so she's not sure who knows and who's figured it out.

In addition, the victim went to weekly therapy sessions, which caused the victim to miss "a lot of school." M.S. further relayed that her other children had been impacted by the Defendant's actions, including going to therapy and taking on other jobs to help with the household bills.

The Defendant's father, Charles Kimble, testified on the Defendant's behalf. According to Mr. Kimble, the Defendant never had "any discipline problems as a child" or any issues with law enforcement "as a young adult." Mr. Kimble said that the Defendant had a "[d]ecent upbringing" with the involvement of both parents and that the Defendant had received "a good education." Mr. Kimble maintained that he "was very shocked and surprised" to learn about the Defendant's crimes, which were "totally out of character for him." Mr. Kimble only knew "[b]its and pieces" about his son's time in the military.

Thereafter, the Defendant gave an allocution statement. The Defendant's entire statement is as follows: "Your Honor, I'd like to apologize to my family and friends. I've lost my life, lost my wife, lost my family, lost my friends. I let a lot of people down, Your Honor. Including myself. I'm here today to weigh my sentencing."

The victim impact statement was also admitted as an exhibit. In the statement, the victim maintained that the abuse began when she was six years of age when the Defendant "grabbed [her] hand and made [her] touch his penis." She said that the Defendant threatened to have her institutionalized if she ever told her mother about the abuse. The Defendant acted upset when the victim tried to deny his advances, so eventually, the victim "ended up agreeing because [she] felt bad." She described a rape when she was eight years old: "About a couple of minutes in I told him to stop because it hurt so much. He ignored what I had said and continued to do what he was doing to me. I ended up crying but he didn't stop until he was done. He tried to tell me that it didn't hurt that bad and to stop crying." The victim said that, "as time went on[, she] got used to it."

Over the ensuing years, their relationship became a series of transactions where the victim "owed" the Defendant sexual favors in return for things "as simple as a new pair of shoes or even a bottle of chocolate milk[.]" Eventually, the Defendant started

conflict between the victim and her mother. When the victim would try to go to a friend's house for the weekend to stay away from the Defendant, he would "try to make [her] do 'things' just to leave the house." The victim explained that the abuse "happened so much that [she] felt as if it would never stop." The victim relayed that the Defendant "tortured [her] for as long as [she could] remember" and that she had contemplated suicide. According to the victim, when she became pregnant, the Defendant instructed her to lie and cover for him.

She missed "weeks of school" and the rest of the wrestling season when she had to travel to Florida for the abortion, and her grades suffered "significantly" as a result. She also relayed that she went to therapy weekly, which further "interrupt[ed her] school work," and that she was now "failing most of [her] classes." Moreover, the victim said that she now had "anxiety around men" when she was alone with them.

After arguments from the parties, the trial court fashioned the Defendant's sentence. The trial court began by considering the enhancement factors set forth in Tennessee Code Annotated section 40-35-114. Noting that the victim was eleven years of age "at best" and in middle school when the abuse began and that she viewed the Defendant as her father, the trial court applied enhancement factor (4)—the victim was particularly vulnerable because of age or physical or mental disability. Next, the court found that enhancement factor (7)—the offense was committed to gratify the Defendant's desire for pleasure or excitement—applied "given the nature of this offense," which "clearly involved a sexual assault on that young child." Finally, the trial court applied factor (14)—the Defendant abused a position of private trust in a manner that significantly facilitated the commission or the fulfillment of the offenses—because the victim "viewed the Defendant as being her father" and it was "[o]nly because of that type of relationship was this able to occur." Furthermore, regarding application of enhancement factor (14), the trial court remarked,

> [T]he victim impact statement indicated that it was used as a means of punishment; if the advances were refused that punishment would be placed, that . . . the child would be punished, that she'd be denied privileges. She was in essence made a captive. This is clearly an abuse of a position of private trust[.]

The trial court then considered the applicable mitigating factors. See Tenn. Code Ann. § 40-35-113. First, the trial court rejected the Defendant's argument that mitigating factor (1)—the Defendant's criminal conduct neither caused nor threatened serious bodily injury—applied. In rejecting this argument, the trial court concluded,

> [E]vidence in this case indicates that this crime was discovered as a result of this child becoming pregnant. Consequently, the [c]ourt does find that

the criminal conduct did cause or threaten serious bodily injury. As a result of this conduct it was necessary for the child to terminate this pregnancy. Her potential health and well-being physically was threatened as a result of this act. Even though there's been no evidence presented as to the psychological or mental injuries sustained, other than the statements of the child in the victim impact statement, but considering alone the fact of the pregnancy the [c]ourt finds that the conduct did threaten serious bodily injury.

Second, regarding application of mitigating factor (13)—any other factor consistent with the purposes of this chapter, the trial court found that the Defendant "had no prior criminal conduct, and to a minimal extent the fact that [the Defendant] did plead guilty."

Thereafter, the trial court sentenced the Defendant to thirty-five years for each rape of a child conviction and fifteen years for the continuous sexual abuse of a child conviction. The parties agreed that the two rape convictions were designated as predicate offenses and that they would, therefore, merge with the continuous sexual abuse offense. See Tenn. Code Ann. § 39-13-518(f) ("In the event that a verdict of guilty is returned on a separate count that was included in the notice of separate incidents of sexual abuse of a child and the jury returns a verdict of guilty for a violation of this section, at the sentencing hearing the trial judge shall merge the separate count into the conviction under this section and only impose a sentence under this section."). Furthermore, no release eligibility was available to the Defendant for the continuous sexual abuse of a child offense. See Tenn. Code Ann. § 40-35-501(l)(1) ("There shall be no release eligibility for a person committing continuous sexual abuse of a child as defined in § 39-13-518 on or after July 1, 2014, until the person has served the entire sentence imposed by the court undiminished by any sentence reduction credits the person may be eligible for or earn.").

In addition, the trial court noted that section 39-13-522(b)(2) required that the Defendant be sentenced, at a minimum, as a Range II, multiple offender for his rape of a child convictions. Those same convictions also required service at 100%. See Tenn. Code Ann. § 40-35-501(i). Ultimately, the trial court rejected the State's request for consecutive sentencing and ordered that all terms were to be served concurrently, which resulted in an effective sentence of thirty-five years' incarceration.

It is from this sentencing decision that the Defendant timely appeals. Before beginning our review, we are constrained to note that there are several errors in the judgment forms. First, the Defendant's four rape of a child judgment forms designate his offender status as a Range I, standard offender rather than the statutorily mandated status of a Range II, multiple offender. See Tenn. Code Ann. § 39-13-522(b)(2). Next, the two rape judgment forms impose sentences in direct contravention of Tennessee Code Annotated section § 39-13-518(f), which states that the trial court shall only impose a

sentence for the continuous sexual abuse a child offense and none for the predicate offenses.[3]  Because there is no sentence to be imposed for these two rape convictions, there should be no range classification, release eligibility, or sentence term designated on the judgment forms.[4]  Also, the Defendant's continuous sexual abuse judgment form designated his 100% release eligibility as imposed pursuant to section 40-35-501(i), rather than the appropriate classification of 100% for a violation of section 39-13-518. Finally, there are not separate uniform judgment forms reflecting the disposition of all twenty-five counts of the indictment but only ones for the guilty-pleaded counts.  See State v. Davidson, 509 S.W.3d 156, 217 (Tenn. 2016) (requiring a trial court to prepare a uniform judgment document for each count of the indictment).  These errors must be rectified on remand.

ANALYSIS

On appeal, the Defendant presents the following issue for our review: whether his thirty-five-year sentences for the rape of a child convictions were excessive.  Specifically, he submits that this "is a situation where the trial court misapplied several enhancement factors that [led] to a departure from the sentencing principles found in the Tennessee Sentence Reform Act."  According to the Defendant, because he "had no criminal history at the time of sentencing and had a demonstrated employment history with the United States Army," he "should have been sentence[d] to a term of no more than twenty-five years instead of the thirty-five years ordered by" the trial court.  The State argues that the trial court did not abuse its discretion in sentencing the Defendant to a within-range sentence because the Defendant "abused a position of private trust to facilitate his repeated sexual abuse" of his step-daughter.

Before a trial court imposes a sentence upon a defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own

---

[3] The judgment forms for the rape convictions reflect that sentences of fifteen years were imposed. However, from our review of the transcript, it does not appear that the trial judge ordered any term of years for these two convictions.

[4] After the original judgment forms on the two rape counts were entered, two amended judgment forms were later entered for each separate count.  These four forms were filed on the same day.  Due to these anomalies, we feel constrained to note that, upon remand, only a single judgment document should be entered for each rape conviction and that all special conditions are to be noted on this single form.

behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). Moreover, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2007). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In accordance with the broad discretion now afforded a trial court's sentencing decision, "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). Carter, 254 S.W.3d at 344.

In this case, the Defendant, as a Range II, multiple offender convicted of a Class A felony, was subject to a sentencing range of twenty-five to forty years for his rape of a child convictions. See Tenn. Code Ann. §§ 39-13-522(b)(1), 40-35-112(b)(1). In asserting that his sentences are excessive, the Defendant claims that the trial court improperly used enhancement factors (4), that the victim was particularly vulnerable because of age or physical or mental disability, and (7), that the offenses were committed to gratify the Defendant's desire for pleasure or excitement to increase his sentence. See Tenn. Code Ann. § 40-35-114. He also contends that the trial court should have found that mitigating factor (1) applied because his conduct neither caused nor threatened serious bodily injury. See Tenn. Code Ann. § 40-35-113. However, he concedes that the trial court properly applied enhancement factor (14), that he abused a position of private trust in a manner that significantly facilitated the commission or the fulfillment of the offenses, to enhance his sentences. As additional favorable considerations, the Defendant cites his lack of a criminal record and his military service.

The Defendant argues that the trial court erred in applying enhancement factor (4) to his sentences because the State failed to prove that the victim was particularly vulnerable because of age or physical or mental disability. Relative to enhancement

factor (4), our supreme court has stated that "the vulnerability enhancement relates more to the natural physical and mental limitations of the victim than merely to the victim's age." State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). Although evidence of particular vulnerably does not need to be extensive, the prosecution bears the burden of proving particular vulnerability. State v. Poole, 945 S.W.2d 93, 97 (Tenn. 1997). The evidence must show that the victim's vulnerability "had some bearing on, or some logical connection to, 'an inability to resist the crime, summon help, or testify at a later date.'" State v. Lewis, 44 S.W.3d 501, 505 (Tenn. 2001) (quoting Poole, 945 S.W.2d at 96). Although a trial court may give weight to the victim's age, a court cannot base its application of factor (4) on the victim's age alone. Poole, 945 S.W.2d at 98. Here, the trial court applied this factor because the victim was "at best" eleven years of age and in middle school when the abuse began and because she viewed the Defendant as her father. The trial court's only additional consideration beyond the victim's age was the nature of the relationship between to the two. We conclude that the record does not support the application of this enhancement factor.

The Defendant also avers that the trial court erred in finding that the offenses were committed to gratify his desire for pleasure or excitement. See Tenn. Code Ann. § 40-35114(7). Our supreme court has explained that, when dealing with the application of enhancement factor (7) to sexual crimes, the trial court must look to the defendant's "motive for committing the offense." State v. Arnett, 49 S.W.3d 250, 261 (Tenn. 2001) (citing State v. Kissinger, 922 S.W.2d 482, 490 (Tenn. 1996)). "[P]roper application of factor (7) requires the State to provide . . . objective evidence of the defendant's motivation to seek pleasure or excitement through sexual assault." Id. at 262. To this end, the court explained that "factor (7) may be applied with evidence including, but not limited to, sexually explicit remarks and overt sexual displays made by the defendant, such as fondling or kissing a victim or otherwise behaving in a sexual manner, or remarks or behavior demonstrating the defendant's enjoyment" of the crime. Id. (citations omitted). In the present case, the trial court found that enhancement factor (7) was appropriate "given the nature of th[ese] offense[s]" and "the fact that it . . . clearly involved a sexual assault on a young child." While the trial court did not specifically address the defendant's motive for committing these offenses, the record supports application of this factor given that the pregnancy indicates the Defendant achieved climax and the transactional nature of the relationship as described by the victim.

Furthermore, there is no doubt from the record, and the Defendant does not contend otherwise, that he violated a position of private trust as contemplated in enhancement factor (14). The trial court reasoned that this factor applied because the victim "viewed the Defendant as being her father" and it was "[o]nly because of that type of relationship was this able to occur." Our supreme court has remarked, "The position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples" of

occupying a position of public or private trust. State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999) (citing Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996)). Moreover, an adult "occupies a position of 'presumptive private trust' with respect to the minor" when the adult and child are members of the same household. Id. The trial court further remarked that the Defendant used the relationship "as a means of punishment" and the victim "was in essence made a captive" because, if she refused the Defendant's "advances," then she would be "punished" and "denied privileges." The record supports the trial court's application of this enhancement factor.

Additionally, the abuse spanned several years, and the victim disclosed that the Defendant had raped her "a lot" and that there were "too many times to count." She also described the relationship as transactional in nature, stating that she "owed" the Defendant sexual favors in exchange for such basic needs as shoes and milk. She would try to escape from the house, but the Defendant would make her do sexual favors in order to leave. According to the victim, the Defendant threatened to have her institutionalized if she ever told her mother about the abuse. The victim had household chores, which included having sex with the Defendant. When she would not comply with the Defendant's sexual demands, he would "ground [the victim] or complain about her not doing her chores" to the victim's mother, who would "in turn fuss at [the victim] as well." According to the victim's mother, the Defendant, as punishment, would "take [the victim's] phone away, or tell her she couldn't go to a friend[']s house, that kind of stuff."

When the victim became pregnant, the Defendant told the victim to lie about the abuse and cover for him. At fourteen years old, the victim decided she wanted to terminate the pregnancy, and she had to travel to Florida for an abortion. The victim continued to seek weekly therapy, requiring her to miss more school. Although she had previously been "a really good student," she was "failing almost every class" at the time of the hearing. The victim said that she was mentally "tortured" and contemplated suicide due to the abuse. Even after the abuse stopped, the victim remained nervous and anxious around the opposite sex. The victim was also scared that others would find out about the abuse. The record is replete with evidence of the psychological injuries the victim suffered and continues to suffer as a result of the Defendant's conduct.

In mitigation, the Defendant argues that his "criminal conduct neither caused nor threatened serious bodily injury." Tenn. Code Ann. § 40-35-113(1). The trial court declined to apply this factor, noting that the victim became pregnant from the sexual abuse. The trial court continued, "As a result of this conduct it was necessary for the child to terminate this pregnancy. Her potential health and well-being physically was threatened as a result of this act." With respect to mitigating factor one, our supreme court has stated that "[e]very rape or sexual battery offense is physically and mentally injurious to the victim." Kissinger, 922 S.W.2d at 486. Furthermore, this court,

-10-

analyzing this factor, has stated, "It is difficult to conceive of any factual situation where the rape of a child would not threaten serious bodily injury." State v. John Ray Thompson, Nos. M2003-00487-CCA-R3-CD & M2003-01824-CCA-R3-CD, 2004 WL 2964704, at *19-20 (Tenn. Crim. App. Dec. 20, 2004) (quoting State v. Edward Earl Huddleston, No. 02C01-9706-CC-00228, 1998 WL 67684, at *3 (Tenn. Crim. App. Feb. 20, 1998)). Importantly, "serious bodily injury" includes an aspect of mental impairment. See State v. Daniel Ross McClellan, No. E2010-02338-CCA-R3-CD, 2012 WL 2356487, at *6 (Tenn. Crim. App. June 21, 2012) (citing Tenn. Code Ann. § 39-11-106(34)(E) (defining "serious bodily injury" to include "protracted loss or substantial impairment of a function of a . . . mental faculty")). Because the rape of a child necessarily involves mental suffering—or at least a threat of such—within the meaning of "serious bodily injury," this mitigating factor is inapplicable to the Defendant's offenses. See McClellan, 2012 WL 2356487, at *6; Thompson, 2004 WL 2964704, at *19; State v. Scott Bradley Price, No. E2000-00441-CCA-R3-D, 2001 WL 1464555, at *2 (Tenn. Crim. App. Nov. 19, 2001); Huddleston, 1998 WL 67684, at *3.

Clearly, the facts that the victim was raped repeatedly beginning no later than age eleven and that she was eventually impregnated and sought an abortion necessarily include mental anguish and suffering.[5] In addition, the minor victim described a specific rape: "About a couple of minutes in I told him to stop because it hurt so much. He ignored what I had said and continued to do what he was doing to me. I ended up crying but he didn't stop until he was done. He tried to tell me that it didn't hurt that bad and to stop crying." The trial court did not err by refusing to consider mitigating factor (1) when it sentenced the Defendant. Moreover, regarding the "catch-all" mitigator (13), the trial court did take into account the facts that the Defendant had no criminal history at the time of sentencing and that he had pled guilty. As stated above, under the 2005 Amendments to the Sentencing Act, the weight given to mitigating factors is left to the sound discretion of the trial court. See Carter, 254 S.W.3d at 344.

We conclude that, in the present case, the trial court properly considered enhancing the Defendant's rape of a child sentences on the bases of the Defendant's position of trust with the victim as her step-father and the physiological injuries to the victim from the repeated sexual abuse, which resulted in an unwanted pregnancy and an abortion. Moreover, Detective Fatula stated that she could not recall the Defendant's ever expressing "any sort of remorse" during the investigation. The circumstances of the offenses establish that the trial court's sentence is consistent with the principles and

---

[5] We note that this court has held that a victim's unwanted pregnancy was a "personal injury," supporting sentence enhancement pursuant to Tennessee Code Annotated section 40-35-114(6) ("The personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great."). See State v. Jones, 889 S.W.2d 225, 231 (Tenn. Crim. App. 1994); see also State v. Smith, 910 S.W.2d 457, 461 (Tenn. Crim. App. 1995).

purposes of our Sentencing Act. Furthermore, a trial court's erroneous consideration of some enhancement factors, which are merely advisory, does not give this court grounds for reversal when the trial court otherwise conforms with the mandates of the Sentencing Act. See Bise, 380 S.W.3d at 709-10; Carter, 254 S.W.3d at 346. Accordingly, we cannot say that the Defendant has established that the trial court abused its discretion by enhancing his sentences to thirty-five years for his rape of a child convictions, and he is, therefore, not entitled to relief. See, e.g., State v. Andrew Young Kim, No. W2017-00186-CCA-R3-CD, 2018 WL 1679346, at *11; State v. Joshua Iceman, No. M2016-00975-CCA-R3-CD, 2017 WL 4805118, at *32 (Tenn. Crim. App. Oct. 24, 2017); State v. Richard Dickerson, No. W2012-02283-CCA-R3-CD, 2014 WL 1102003, at *12 (Tenn. Crim. App. Mar. 19, 2014) (all three cases concluding that the trial court improperly considered two of three enhancement factors it applied but, nonetheless, otherwise conformed with the mandates of the Sentencing Act, so the defendant was not entitled to relief).

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the sentencing decision of the trial court is affirmed. However, we remand for entry of corrected judgment forms as set forth herein and for entry of additional judgment forms covering each count of the indictment.

_____
D. KELLY THOMAS, JR., JUDGE